IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


BRIAN D. FOX,

       Plaintiff,

v.                                      Case No. 14-4022-JTM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

       Defendant.


MEMORANDUM AND ORDER

In 2010, Plaintiff Brian Fox applied for Disability Insurance Benefits (DIB) under
Title II of the Social Security Act, 42 U.S.C. §§ 401-433 and Supplemental Social Secuirty
(SSI) under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3. The Commissioner of Social
Security denied his application upon initial review (Tr. 108, 118-19, 122-26, 128-33), and
Fox sought review by an Administrative Law Judge (ALJ). Following a hearing on May
2, 2012, the ALJ determined that Fox was not disabled within the meaning of the Act.
(Tr. 13-24). The decision of the Commissioner became final when the Appeals Council
declined Fox's request for review on January 31, 2014. (Tr. 1-3).

Fox then filed this appeal, raising multiple arguments. First, he contends that the
ALJ erred in his determining that Fox could perform any competitive employment in
light of testimony by the vocational expert (VE). (Dkt. 13, at 20-21). Second, he contends
that he met the standards for Listed Impairments 12.04 and 12.06. (Id. at 22-24). Third,

he argues that the ALJ failed to give sufficient weight to a treating physician, Dr. Danielle Skirchak. (*Id*. at 25-27). Fourth, he argues that the ALJ erred in determining that his subjective statements were less than fully credible. (*Id*. at 27-30). And finally, he argues that the ALJ's assessment of his residual functional capacity lacks substantial evidence. (*Id*. at 30-32). The detailed facts of the case, which are incorporated herein, are set forth independently in the decision of the ALJ (Tr. 15-22), and the Briefs of the plaintiff (Dkt. 13, at 2-19) and the Commissioner (Dkt. 2-6). For the reasons provided herein, the court finds that the Commissioner's decision was supported by substantial evidence contained in the record, and the decision of the Commissioner is affirmed.

Plaintiff-claimant Fox was born on October 24, 1961 and has stated that he became disabled beginning June 21, 2009, due to a variety of mental and physical ailments). He has a high school education, and two years of college.

The ALJ found that Fox had the severe impairments of bipolar disorder, affective disorder, anxiety disorder, congenital loss of the left middle finger, and disorder of the back. However, the ALJ also found that none of these impairments met or exceeded the standards for any Listed Impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15). Fox retained the functional capacity to perform light work of a simple, repetitive, routine nature, with as little stress as possible. (Tr. 17). He cannot perform work with high quotas, and should have only limited contact with the consuming public and supervisors. He cannot engage in fine manipulation or use his left hand repetitively, although he can occasionally finger with that hand. He cannot use foot controls, and must work on a smooth level surface. He cannot work at unprotected

heights, operate dangerous machinery or climb ladders, ropes, or scaffolds. He can bend occasionally, but cannot crouch, kneel, crawl or squat. He also cannot do work which requires acute hearing. Given this capacity, Fox can work as a retail marker, collator machine operator, or inserting machine operator.

Under the Act, the court takes as conclusive the factual findings of the Commissioner so long as these are "supported by substantial evidence." 42 U.S.C. § 405(g). The court thus looks to whether those factual findings have such support, and whether the ALJ applied the correct legal standard. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "Substantial evidence" means "more than a scintilla, but less than a preponderance; in short, it is such evidence as a reasonable mind might accept to support the conclusion." *Barkley v. Astrue*, 2010 WL 3001753, *1 (D. Kan. July 28, 2010) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)). In making this determination, the court must "neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.3d 799, 800 (10th Cir. 1991)).

A claimant is disabled if he or she suffers from "a physical or mental impairment" which stops the claimant "from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months." *Brennan v. Astrue*, 501 F.Supp.2d 1303, 1306-07 (D. Kan. 2007) (citing 42 U.S.C. § 423(d)). This impairment "must be severe enough that she is unable to perform her past relevant work, and further cannot engage in other substantial gainful work existing

in the national economy, considering her age, education, and work experience." *Barkley*, 2010 WL 3001753, *2 (citing *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002)).

Pursuant to the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a).   The steps are designed to be followed in order.   If it is determined, at any step of the evaluation process, that the claimant is or is not disabled, further evaluation under a subsequent step is unnecessary. *Barkley*, 2010 WL 3001753, at *2.

The first three steps of the sequential evaluation require the Commissioner to assess: (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged disability; (2) whether the claimant has a severe, or combination of severe, impairments; and (3) whether the severity of those impairments meets or equals a designated list of impairments. *Lax*, 489 F.3d at 1084; *see also Barkley*, 2010 WL 3001753, *2 (citing *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)).   If the impairment does not meet or equal one of these designated impairments, the ALJ must then determine the claimant's residual functional capacity, which is the claimant's ability "to do physical and mental work activities on a sustained basis despite limitations from her impairments." *Barkley*, 2010 WL 3001753, *2; *see also* 20 C.F.R. §§ 404.1520(e), 404.1545.

Upon assessing the claimant's residual functional capacity, the Commissioner moves on to steps four and five, which require the Commissioner to determine whether the claimant can either perform his or her past relevant work or whether he or she can generally perform other work that exists in the national economy, respectively. *Barkley*,

2010 WL 3001753, *2 (citing *Williams*, 844 F.2d at 751). The claimant bears the burden in steps one through four to prove a disability that prevents performance of his or her past relevant work. *Lax*, 489 F.3d at 1084. The burden then shifts to the Commissioner at step five to show that, despite his or her alleged impairments, the claimant can perform other work in the national economy. *Id*.

In support of his argument, Fox points to his extensive medical record. Certainly Fox had many interactions with Johnson County Menth Health Center (JCMH) personnel in which he reported having extensive medical difficulties. Fox told the workers at JCMH on numerous visits of his problems with nervousness, depression, nightmares, and that he had thoughts of suicide. (Tr. 365, 453, 469, 489, 497, 792). In other instances, Fox indicated he was not having problems with concentration, feelings of hopelessness, or thoughts of suicide. (Tr. 342). The objective record does not appear to independently document any actual suicide attempts by Fox. Rather, during the period he twice reported to Emergency Departments with scabbing on his skin, with Fox reporting that he had "a nervous tick … that causes me to pick my skin." (Tr. 757, 759, 764).

Many of Fox's contacts with JCMH were with therapist Lois Moore (LSCSW). In 2008, Fox expressed to Moore "feelings of concern about not being able to find a job." (Tr. 364). He indicated that he felt depressed and anxious. He also discussed his finances with her, and stated that he "is probably going to get a lawyer and try for disability as his parents are pressing him to do this." (*Id*.)

5

On August 11, 2009, Moore noted: "Client reported doing well, even though he has not been on his medications for three weeks. Client was laid off work and could not afford to get his medications." (Tr. 338-39) On August 11, 2009, it was noted he "has a new job starting soon." (Tr. 338)

Fox frequently indicated that his finances were a concern. However, JCMH personnel "[a]ssured him we have samples and can get him on a patient assistance program." (Tr. 469).

During the period 2009 to 2012, Dr. Skirchak of JCMH monitored and adjusted Fox's medications, as needed. These medications included Depakote, Risperdal, Ativan (for panic attacks), Trazodone (insomnia), Abilify, and Cymbalta.

Fox told Dr. Skirchak on December 9, 2009, that he had lost his job the previous June because "he was smoking on the job, [and] he made some comment about 'C4 explosives in a mailbox, I was being stupid.'" (Tr. 342). He told Dr. Skirchak that he was currently looking for a job. As a result of her examination, Dr. Skirchak concluded that Fox appeared

> [a]lert and oriented X 3, fair grooming and hygiene, cooperative, smiles at times, friendly, good eye contact. Some mild increase in psychomotor activity, speech regular rate and rhythm, thought process is a little circumstantial. Thought content is negative for auditory or visual hallucinations, suicidal ideation and homicidal ideation, paranoia, or delusions. Mood described as "good[.]" Affect is full range. Fair to Good concentration. Insight is full and judgment is fair.

(Tr. 343). With respect to his medications, Dr. Skirchak noted that Fox "reports no problems with Cymbalta" and that "Trazodone helped" his condition. (Tr. 342, 343).

Dr. Skirchak saw Fox again on July 2, 2010. She reported that Fox was "[c]oncentrating well," his "[e]nergy is good," and he was "[d]oing fine when on meds." (Tr. 360). Fox stated that he "sleeps well with [Ativan]." (*Id.*) She again concluded that Fox's mental status indicated full insight, fair judgment, and a lack of suicidal ideations.

On August 25, 2011, Dr. Skirchak again saw Fox, and adjusted his medications after he indicated he "doesn't feel he is doing well." (Tr. 487, 491). He reported sleeplessness and suicidal ideations.

Dr. Skirchak evaluated Fox on September 23, 2011. He told her that there was "no way I can go to work" which he attributed only partly due to the anxiety about "facing the public," but also because of "back pain and can[']t do physical labor." (Tr. 497). He was "having relationship problems with 'horrible wife,'" and "has attorney working on disability." (*Id.*) Generally, Fox reported that he was "overall better, energy is a little better, less hopelessness, less SI [Suicidal Ideation]." (*Id.*) Fox was then "comfortable with [his] meds." (*Id.*) Although he sometimes felt "hung over" from Risperdal, and sometimes overslept, he told Dr. Skirchak "I can tolerate" it. (*Id.*) He was "taking 200 mg of trazodone and sleeping better, Ativan is helping for panic [with] no other side effects." (*Id.*) Fox was cautioned on his use a marijuana. (Tr. 501).

Fox saw Dr. Skirchak again on November 5, 2011, immediately after his wife indicated that she wanted a divorce. He felt she was being cruel. However, Dr. Skirchak reported that he appeared to be "[c]oncentrating well" and was "[d]oing fine when on psych meds." (Tr. 456).

Shortly afterwards, on November 18, 2011, Fox visited with Lisa Gugler (LSCSW) and told her that he was experiencing a "continued struggle with 'PTSD' from his brother's Vietnam war experience and having bad dreams of this and also daytime 'like I'm there experiences.'" (Tr. 547). Ms. Gurgler warned him of the dangers of his continued use of marijuana, and Fox "agreed to consider not using cannabis." (*Id.*) He explained, "I'm a closeted junkie – I'd try anything. I used to use drugs y[ea]rs ago and stopped crack cold turkey." (*Id.*)

On December 16, 2011, Fox again saw Dr. Skirchak. He indicated he was "sleeping all the time" and "not interested in anything." (Tr. 551). Dr. Skirchak noted her earlier recommendation that Fox stop using marijuana, and Fox claimed that he had not used marijuana for two months. Dr. Skirchak noted that Fox had told his therapist Ms. Gugler he was continuing to use marijuana less than a month before. Fox denied having any suicidal ideations, and reported that he was "feeling some improvement" after his Depakote was adjusted. (*Id.*)

Dr. Skirchak saw Fox again on January 13, 2012, after he had been briefly hospitalized after a fall. The hospital had noted the drugs in Fox's system, particularly the Depakote "as his level was in the 100's" and issued assessments which were "mainly concerned that it was a 'narcotic event' and was possibly too much opiate medicine" in combination with pneumonia. (Tr. 560). Fox stated he was not experiencing suicidal ideations, but felt "shakey all the time." (*Id.*) Fox wanted Dr. Skirchak to increase his Depakote, which the hospital had reduced, but "can[']t give many reasons to to do [sic]." (*Id.*). Fox denied using illegal drugs or alcohol. He

appeared "oriented and alert and awake," although his response time was decreased. (Tr. 564).   Dr. Skirchak adjusted his medications, noting a concern that Fox "has overtaken his other meds before and opiates so unclear at this time" as to the best approach to take. (*Id.*)

On April 11, 2012, Dr. Skirchak examined Fox shortly before a scheduled administrative hearing. He denied any suicidal ideations. He indicated he had "less nightmare, less mood swings." (Tr. 771). He was also "sleeping better," although he had "some depression." (*Id.*) Yet again, Dr. Skirchak warned Fox against the continued use of marijuana, and noted that Fox "does not appear to agree." (Tr. 775).

On September 28, 2012, Fox again met with Ms. Gugler, and reported that his wife was feeling stressed, as she was working two jobs. Otherwise he and his wife were "doing fairly well." (Tr. 790). In addition, he indicated that his "SSDI third appeal [was] denied and his attorney is resubmitting for it – so that has been depressing him." (*Id.*) He stated he was having "fleeting" suicidal ideations (*Id.*) He further reported that he was seeing a new pain doctor, and was "feeling better." (*Id.*)

Dr. Skirchak completed a Medical Source Statement on September 27, 2011, indicating that Fox had significant mental limitations. (Tr. 463-65). She also responded to a request from Fox's attorney, stating that she believed that Fox met the requirements for a listed impairment. (Tr. 802-807).

Fox's condition was also reviewed by Dr. Bruce Bean (Ph.D.) a consultative psychologist. In the consultative interview on November 29, 2010, Fox told Bean that his complaint was "primarily being related to his 'chronic and severe depression,'" which

was in turn "primarily related to his wife being extremely verbally abusive." (Tr. 370). "He also states that he has an 'inability to retain jobs for unknown reasons.'" (*Id.*) Fox stated that he also had severe back problems, although with medication, "he is feeling somewhat better and is experiencing less pain." (*Id.*) Contrary to his statements to JCMH personnel as to his ongoing marijuana use, Fox told Dr. Bean that he had used cocaine "for about one year around 1989 to 1990" but that he "has not used any drugs since." (Tr. 371).

Dr. Bean found that Fox appeared "well oriented x 4," although he had "some difficulty" with maintaining focus. (Tr. 372). While he exhibited some confusion, Dr. Bean believed that Fox had "cognitive abilities within the average to perhaps slightly below average," although "he presents himself in a rather scattered, confused and confounded manner." (Tr. 372). "Cognitively, [Fox] seems to have the capacity to understand and perform tasks with appropriate training, monitoring, and supervision," although he might not be able to sustain that functioning indefinitely. (Tr. 373).

Dr. Maurice Prout (Ph.D.), a state agency psychologist, reviewed Fox's medical records on December 9, 2010. In a check-the-box form, Dr. Prout indicted that Fox had exhibited a "Disturbance of mood, accompanied by a full or partial depressive syndrome, as evidenced by at least one of the following … 3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)." (Tr. 377-78). Dr. Prout believed that Fox was mildly restricted as to his activities of daily

living, moderately restricted as to social functioning and maintaining concentration, persistence and pace, and had "One or Two" episodes of decompensation. (Tr. 383).

To address issues of mental impairment under § 12.00 of the schedule of Listed Impairments, the Commissioner evaluates a claimant's restrictions pursuant to the "Paragraph B" and "Paragraph C" criteria psychiatric set forth in the applicable regulations. See 20 C.F.R. § 404.1520a; 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04, 12.06; Social Security Ruling (S.S.R.) 96-8p, 1996 WL 374184, at *4. Paragraph B looks at the functional limitations imposed by mental conditions on four separate criteria. Listings 12.04 and 12.06 both require at least two of the following criteria: (1) marked restrictions on the activities of daily living, (2) social functioning, (3) maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration. A marked restriction is one which is more than moderate, but less than extreme. *Chrismon v. Colvin*, 531 Fed.Appx. 893, 896 (10th Cir. 2013).

The ALJ here found that Fox met none of the "Paragraph B" criteria for Listed Impairments 12.04 or 12.06. The ALJ wrote:

> In activities of daily living, the claimant has a mild restriction. The claimant testified he uses the internet for an hour. The August 11, 2009 mental health note indicated claimant was starting a new job soon. In an October 8, 2010 Function Report-Adult the claimant stated he lives in an apartment, has problems taking care of his personal needs and prepares simple meals up to three times a week, drives, rides in cars and shops up to twice a week. He indicated he watches television and listens to the radio. On December 1, 2010 claimant reported he had a job during Christmas. Although not at a substantial or gainful level, claimant worked after the alleged onset date, from which one can infer some ability to function.

In social functioning, the claimant has moderate difficulties. This finding is based upon claimant's testimony that he has problem being around crowds. However, in an October 8, 2010 Function Report-Adult the claimant goes outside up to four times a week, visits with others, goes to church, Bible study and mental health appointments and does not need to be accompanied.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. Claimant testified he could not remember things. This is not consistent with the October 8, 2010 Function Report-Adult where claimant stated he prepares simple meals up to three times a week, drives, rides in cars and shops up to twice a week. He indicated he pays bills, handles money, watches television, visits with others and goes to Bible study.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

(Tr. 16 (record citations omitted)).

The ALJ further found that Fox did not meet the "Paragraph C" criteria, because the evidence did not show that he had a mental disorder lasting for two years or more with symptoms or signs currently attenuated by medication or psychosocial support and with  repeated episodes of decompensation of an extended duration. The evidence did not show that Fox had any impairment under which "even a minimal increase in mental demands would cause an individual to decompensate or a history of one or more years' inability to function outside a highly supportive living arrangement." (Tr. 17).

The court finds that the ALJ's assessment was not erroneous. Although plaintiff points to some evidence in the record which might support a contrary finding (Dkt. 21, at 5-16), the controlling standard of review requires the court to determine whether the ALJ's assessment is supported by substantial evidence. *See Richardson v. Perales*, 402 U.S.

389, 391 (1971). The record provides such support, including objective medical evidence showing good mood and affect, fair to normal judgment, normal thought process, fair to good concentration, and successful treatment of Fox's mental impairments with appropriate medications. With treatment, Fox was able to engage in various daily living activities including operating a computer, building models, occasionally playing golf, preparing light meals, driving, and performing light housekeeping.

The plaintiff relies in particular upon the conclusory findings by Dr. Prout suggestive of the existence of a listed impairment; however, the ALJ was not obliged to accept these findings without qualification. In the narrative portion of his report, Dr. Prout observed that Fox "is capable of understanding and following simple instructions on a sustained basis. He is moderately limited in interacting with supervisors and the gen[eral] pub[lic]. Given the above, there are no limitations in adaptation." (Tr. 388). Further, the ALJ could, and did, reasonably rely on the underlying objective records reviewed by Dr. Prout, records which as noted above, may be taken as supporting a finding that Fox's mental impairments were mild in the impact on his daily living, his social functioning, and his ability to maintain concentration and pace, and which further failed to document the required episodes of decompensation.

The plaintiff also argues that the ALJ erred in giving reduced weight to the ultimate medical assessments offered by Dr. Skirchak, or in failing to recontact her as to the impact of his drug usage. As a general rule, an ALJ must consider and weigh *all* medical opinions.  *See* 20 C.F.R. § 404.1527(b)-(c) (stating that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence

we receive" and "[r]egardless of its source, we will evaluate every medical opinion we receive."). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including his symptoms, diagnosis and prognosis, what he can still do despite impairment(s), and his physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2).

Social Security regulations identify three types of "acceptable medical sources:" (1) treating sources, *i.e.*, medical sources who have treated or evaluated the claimant or who have had "an ongoing treatment relationship" with the claimant; (2) non-treating sources; *i.e.*, medical sources who have examined the claimant but lack an ongoing treatment relationship; and (3) non-examining sources, *i.e.*, medical sources who render an opinion without examining the claimant. *See* 20 C.F.R. § 404.1502; *Pratt v. Astrue*, 803 F. Supp. 2d 1277, 1282 n.2 (D. Kan. 2011). The Commissioner generally gives more weight to the opinions of examining sources than to opinions of non-examining sources. 20 C.F.R. § 404.1527(c)(1). And the Commissioner generally gives the most weight to treating sources because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). The Commissioner will give the opinion of a treating source controlling weight when it is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  An ALJ must state "specific, legitimate reasons" for declining to give controlling weight to the opinion of a treating physician.  *Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009).

Absent assigning controlling weight, an ALJ must consider the six specific factors set out in 20 C.F.R. § 404.1527(c)(1)-(6) in determining how much weight to accord the opinion of a treating physician.  *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007).  These factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (internal quotations omitted).  Although there is no requirement that an ALJ conduct a factor-by-factor analysis, his opinion must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (citation and quotation marks omitted).  When an ALJ completely rejects an opinion of a treating source, he must state specific and legitimate reasons for the decision.  *Watkins*, 350 F.3d at 1300.  Failure to apply the correct legal standards in weighing the opinion of a

treating physician may result in a reversal and remand. *Goatcher v. U.S. Dept. of Health & Human Servs.*, 52 F.3d 288, 289 (10th Cir. 1995).

Here, the ALJ carefully reviewed the medical record. With respect to Dr. Skirchak's summary mental evaluations, the ALJ wrote:

> The undersigned gives little weight to this opinion because it is not well supported by medically acceptable clinical and diagnostic techniques, claimant's work activity after the alleged onset date or claimant's statements about his activities of daily living (SSR 96-2p). Further, if claimant were as limited as described in this opinion he should be living in a structured environment. This opinion did not address the impact of claimant's substance abuse upon his mental condition.

(Tr. 22 (record citations omitted)).

The court finds no error in the decision to give reduced weight the opinion offered by Dr. Skirchak. The ALJ properly evaluated that opinion in the light of the entire record, as well as Fox's own reported activities of daily living. The record, as the ALJ noted, includes objective evidence suggestive of a functional capacity much greater than the extreme restrictions set forth in Dr. Skirchak's final opinion. Indeed, Dr. Skirchak's own treatment notes generally indicated that Fox was in partial remission with mood stability, that he had fair to good concentration, his insight was full, and his judgment fair. (Tr. 343). Fox contacted Dr. Skirchak for help obtaining medicine, stating that he "[f]eels he is okay for now," and "just knows he is better with [his medications]." (Tr. 342). He did report sleeplessness, but "[t]his occurred only off medications." (*Id.*) He reported some instances of depression or mania, "6 episodes a year," but denied suicidal ideation, hopelessness, delusions, frequent panic attacks, anxiety, or nightmares. (*Id.*)

The ALJ also viewed Dr. Skirchak's opinion in the context of the opinions of other medical sources, and addressed in detail Fox's treatment record. (Tr. 18-19). As the ALJ appropriately observed, as for claimants' mental impairments, "the undersigned notes the mental status exams of record indicate claimant had minimal findings prior to August 5, 2011,"  and that by "January 13, 2012, there was significant improvement in claimant's mental status." (Tr. 20). The ALJ also gave some weight to the consultative evaluation of Dr. Bean on November 29, 2010. (Tr. 370). Dr. Bean indicated that Fox can develop and maintain relationships, although he may have some difficulty in sustaining them. According to Dr. Bean, Fox can understand and perform tasks with appropriate training, monitoring and supervision, although he may have some difficulty in sustaining such tasks. Similarly, the ALJ explicitly gave some weight to the opinions of Drs. Prout and Blackman, who agreed that Fox can understand and follow simple instructions on a sustained basis and perform work allowing a moderate limitation on interacting with others.

Again, the issue is not whether the court would reach the same conclusion as to the ultimate issue of disability, but whether the ALJ's decision is supported by substantial evidence and whether the ALJ's decision was sufficiently clear to allow the court to understand the reasons for a particular weight assigned to the opinion of the claimant's treating physician. *Watkins*, 350 F.3d at. Applying this standard, the court finds no error.

Further, Fox has not shown that the ALJ erred in failing to recontact Dr. Skirchak for additional evidence. The ALJ noted the existing and substantial medical record, and

obtained additional, consultative medical evidence. The ALJ had an adequate record with which to resolve the issues in the action, including Dr. Skirchak's own treatment notes, which document her consistent advice to Fox to reduce his misuse of drugs. The ALJ had a sufficient basis for resolving the claim, and articulated the reasons for his decision.

Fox next argues that the ALJ erred in discounting his credibility. A claimant's subjective complaints are evaluated for credibility under a three-step analysis that asks, in the case of a claim of disabling pain:

> (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether the impairment is reasonably expected to produce some pain of the sort alleged (what we term a "loose nexus"); and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's pain was in fact disabling.

*Keyes-Zachary*, 695 F.3d at 1166-67 (citing *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987)).  The ALJ "must consider the entire case record, including the objective medical evidence" to determine whether plaintiff's subjective claims are credible.  SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996).  The ALJ should consider "a claimant's persistent attempts to find relief for her pain and her willingness to try any prescribed treatment prescribed," regularity of contact with her doctor, possible psychological disorders that may combine with physical problems, daily activities, and daily dosage and effectiveness of medications.  *Keyes-Zachary*, 695 F.3d at 1167.

The ALJ need not make a "formalistic factor-by-factor recitation of the evidence" if he specifies evidence relied on in the credibility analysis.  *Id.* (citing *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)).  "[A] credibility determination 'must contain specific

reasons for the finding on credibility, supported by the evidence in the case record' and be 'sufficiently specific' to inform subsequent reviewers of both the weight the ALJ gave to a claimant's statements and the reasons for that weight." *Hayden v. Barnhart*, 374 F.3d 986, 992 (10th Cir. 2004) (quoting SSR 96-7p, 1996 WL 374186, *4).

Recognizing that "some claimants exaggerate symptoms for the purposes of obtaining government benefits," (*Bolan v. Barnhart*, 212 F. Supp. 2d 1248, 1260 (D. Kan. 2002) (citing *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987)), an ALJ's credibility determinations are generally treated as binding on review. *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990); *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983). "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence. *Wilson*, 602 F.3d at 1144; *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005). The court cannot displace the ALJ's choice between two fairly conflicting views even though the court may have justifiably made a different choice. *Oldham*, 509 F.3d at 1257-58. However, notwithstanding the deference generally given to an ALJ's credibility determination, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Wilson*, 602 F.3d at 1144 (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1998)).

Here, the ALJ's credibility determination was not erroneous. The ALJ noted that Fox's subjective complaints were inconsistent with the general medical record, as well as his activities of daily living. The ALJ also noted the plaintiff's subjective claims of spinal pain, but also in testimony could "not recall how he hurt his back," and further

observed these claims were inconsistent with the objective medical record. (Tr. 20). The ALJ noted that Fox was not compliant with medical advice, and in fact gave inconsistent stories to medical providers as to his use of illegal drugs. (*Id.*) Fox had no substantial record of adverse side effects from his medications. While Fox claimed that he was unable to afford mediations, the record indicates that he refused or ignored offers of free medication samples or participation in a patient assistance program. The ALJ also accurately noted that Fox's participation in some limited employment, while amounting to less than substantial gainful activity, indicated "a sporadic work history" evidencing "little motivation to work." (Tr. 21). Reviewing the entire record, the court cannot find that this assessment, or the larger credibility determination, was unfair or incorrect.

Fox argues that the ALJ should have considered him as having a functional capacity that was more restricted in light of his finings as to "moderate" impairments with respect to the listed impairment analysis. Social Security Ruling 96-8p provides that the residual functional assessment "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996).  Under the Ruling, the initial assessments under Paragraphs B and C at steps two and three are relevant but not controlling factors for the more detailed functional assessment required at steps four and five. See Program Operations Manual System § DI 24510.065.B.1, 2001 WL 1933372, at *1. Here, the ALJ's determination of Fox's residual functional capacity is supported by a careful function-by-function analysis, and is supported by substantial evidence.

Fox argues that the ALJ erred in light of testimony by the VE indicating that, if he had additional, moderate limitations in areas such as social functioning, there would be no competitive employment he could perform *at all*. (Dkt. 21, at 1-4). The court finds no error in the ALJ's treatment of the VE testimony. The ALJ explicitly stressed that his his assessment of the Paragraph B criteria were not an assessment of Fox's functional capacity, and that the capacity actually assigned reflected a "more detailed assessment" of Fox's abilities. (Tr. 17).

"Hypothetical questions posed to the vocational expert must reflect with precision a claimant's impairments, *but only to the extent that they are shown by the evidentiary record*." *Hawkins v. Astrue*, 2011 WL 4496586, *5 (D. Kan. Sept. 27, 2011) (citing *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) (emphasis added)). Here, as noted earlier, the ALJ's actual assessment of Fox's functional capacity is supported by substantial evidence, and plaintiff has failed to demonstrate error in the ALJ's treatment of the VE testimony. *See Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir. 1995) (ALJ not required to acccept answer to hypothetical which included limitations that were not actually adopted).

IT IS THEREFORE ORDERED this 29th day of September, 2015, that the judgment of the Commissioner is affirmed.

_____s/ J. Thomas Marten_____
J. THOMAS MARTEN, JUDGE